## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **SANDRA L. TITE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 3:06-cv-591-DGW** |
| | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY ADMINISTRATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM AND ORDER

This matter is before the Court on the Petition for Revocation of the Commissioner's Decision Denying Benefits (entitled "Plaintiff's Brief") filed by Sandra L. Tite ("Plaintiff") on November 20, 2006 (Doc. 15). For the reasons set forth below, Plaintiff's petition is **GRANTED**, this case is **REVERSED and REMANDED** for further proceedings consistent with this Court's Order.

### FACTUAL BACKGROUND

**Procedural History**

On September 13, 2000, Plaintiff filed an application requesting supplemental security income benefits alleging that she became disabled on or around September 1, 1992 (Tr. 2). The Social Security Administration denied the application on January 11, 2001, and the denied it again on April 20, 2001, upon Plaintiff's request for reconsideration. Eleven days later, Plaintiff filed a formal request for a hearing, which was granted.

The hearing was held on December 18, 2001, before an administrative law judge ("the ALJ"). Plaintiff timely appealed to the Appeals Council, and they remanded the case back to the ALJ for a rehearing because the record of the December 18th hearing could not be found (Tr.

108-09).

      The ALJ conducted this second hearing on February 7, 2006, and Plaintiff appeared represented by counsel (Tr. 204-48).  The ALJ again issued an opinion denying Plaintiff benefits, concluding Plaintiff was not disabled as defined by the Social Security Act (Tr. 13-21). The ALJ based her determination largely on a finding that Plaintiff's reports of pain and ability were generally not credible (Tr. 18-21).

      After unsuccessfully appealing to the Appeals Counsel, Plaintiff now seeks judicial review of the Agency's final decision pursuant to 42 U.S.C. § 405(g).

**Substantive History**

      Plaintiff, forty-eight years old at the time of the ALJ's decision, has a high school equivalency education (GED) and no vocationally-relevant past work experience (Tr. 127-30; 207).  She asserts that her disability commenced on or about September 1, 1992, when she became unable to work due to chronic anxiety, panic attacks, depression, rheumatoid arthritis, and her attention deficit hyperactivity disorder ("ADHD") (Tr. 132-33).

      Beginning in 1989, Plaintiff made visits to her family physician, Dr. Albert Bledig (Tr. 209).  The first of these visits documented in the record occurred on February 7, 2000, where Dr. Bledig noted that  "[h]er main problem is tension and some depression," and prescribed Xanax and Restoril for her anxiety and sleeping problems (Tr. 71).

      Plaintiff routinely visited Dr. Bledig throughout the year 2000, keeping appointments on March 29, April 24, July 27, October 11, December 21, and December 28, 2000 (Tr. 66-71). During these exams, Dr. Bledig consistently noted that Plaintiff was "depressed" and "anxious" due primarily to financial and relationship problems (Tr. 66-71).

2

On November 3, 2000, Plaintiff began visiting therapist Mary Ann Hillard, M.A., for psychological treatment at the Egyptian Health Center (Tr. 54).  From the initial examination, Ms. Hillard notes that Plaintiff appeared well-groomed, had normal interest and manner of speaking, displayed appropriate affect, was cooperative in answering questions, had normal thought processes, was oriented to place and time, and displayed average intelligence – but was also worried and, therefore, seeking help (Tr. 54, 59).  Ms. Hillard diagnosed Plaintiff with post traumatic stress disorder (Axis I), generalized anxiety disorder (Axis I), borderline personality disorder (Axis II), migraines (Axis III), and additional psychological stressors of past abuse by her father and ex-husbands (Axis IV) (Tr. 54, 59).  Ms. Hillard characterized the severity of Plaintiff's conditions as being moderate and enduring (Tr. 59).

On the Global Assessment of Functioning ("GAF") Scale, Ms. Hillard reported that Plaintiff was functioning at a current level of forty-five (45), meaning that she demonstrated severe symptoms or severe impairment in social, occupational, or school functioning (Tr. 60). She estimated that Plaintiff's highest GAF was seventy-five (75), meaning that if Plaintiff presented symptoms, they were transient and expected reactions to psycho-social stressors with no more than slight impairment in social, occupational, or school functioning (Tr. 60).  During the assessment, Plaintiff reported that her major stressors were a lack of financial support and past abuse, but she also stated that she had emotional support from her uncle and a friend (Tr. 56-57).

On November 21, 2000, Plaintiff first consulted with internist James L. Schutzenhofer, M.D., and Stephen G. Vincent, Ph.D., for agency evaluations (Tr. 41-46).  Dr. Schutzenhofer noted that Plaintiff had experienced high blood pressure in the past, but that it was well-

controlled with the medication Tenormin (Tr. 41, 43).  Plaintiff was also taking Xanax, Zoloft, and Celebrex at that time.  Further, Plaintiff was in good general health and was able to heel walk, toe walk and squat.  She could lumbar flexion to ninety degrees without tenderness or spasm, had good grip strength, fine finger movements, and finger-thumb opposition bilaterally without evidence of intrinsic muscle atrophy of her hands (Tr. 42-43).

Later that same day, Plaintiff saw Dr. Vincent who observed that Plaintiff was walking with a limp and reported right hip and knee pain (Tr. 44).  Dr. Vincent diagnosed Plaintiff with panic disorder, agoraphobia, and recurrent, moderate depression (Tr. 46).  Plaintiff reported symptoms of depression, stating that she felt hopeless, helpless, useless, worthless, and that she occasionally succumbed to uncontrollable crying spells (Tr. 45).  She claimed to be overcome by thoughts of death, although she denied being suicidal, and she reported sleep difficulties, lethargy, and low self-esteem (Tr. 45).

Plaintiff also reported that her mental health history included a period of severe panic attacks that caused her to seek help from a day treatment program at the Bradford House (Tr. 44).  She told Dr. Vincent that she quit the program after only three days because she found that "it turned out to be a joke." (Tr. 44).  Dr. Bledig's July 27, 2000, exam notes indicate that Plaintiff left the Bradford House after only one day (Tr. 70).  Plaintiff told Dr. Vincent that she was socially isolated because she did not want to be "bothered by people," yet admitted she was driven to the appointment by a girlfriend (Tr. 45).

Dr. Vincent observed that Plaintiff's speech was without inflection or intonation, secondary to psychomotor retardation (Tr. 45).  He reported that her affect was moderately depressed, and that she was somewhat anxious or nervous (Tr. 45).  Dr. Vincent found that

4

although her thought processes were slow, they were deliberate, logical, and relevant (Tr. 45). He further opined that, despite her diagnosis, Plaintiff could effectively manage her own funds (Tr. 46).

On December 26, 2000, a state agency psychologist performed a functional capacity assessment and concluded that Plaintiff "retains the capacity to perform and sustain simple tasks which have few social demands" (Tr. 25). In no category did the reviewing psychologist determine that she was "markedly limited" (Tr. 23-24). Further, the psychologist commented that Plaintiff was capable of living independently, performing daily tasks, and caring for her dogs (Tr. 25). When rating Plaintiff's functional limitations, the state psychologist determined that Plaintiff was moderately limited in the "B" criteria restrictions of (1) activities of daily living, (2) difficulties in maintaining social functioning, and (3) difficulties in maintaining concentration, persistence, or pace (Tr. 37). He did not find any limitation with regard to repeated episodes of decompensation (Tr. 37). He also reported that there was no evidence to establish the presence of "C" criteria (Tr. 38).

Plaintiff continued to visit Dr. Bledig in 2001. On February 14, 2001, she sought treatment for lack of sleep purportedly brought on by the death of her pet (Tr. 65). Dr. Bledig reported that Plaintiff appeared nervous and shaky (Tr. 65). Later that month, Plaintiff returned to Dr. Bledig for a refill of Xanax (Tr. 64). She reported that she felt nervous and jittery, and easily angered (Tr. 64). On March 20, 2001, Plaintiff again consulted Dr. Bledig for insomnia, depression, and anxiety (Tr. 63).

In February of 2001, Angela Cain at the Egyptian Health Center helped Plaintiff develop an individual treatment plan (Tr. 47-53). Ms. Cain reiterated the diagnoses and GAF ratings

previously given to Plaintiff by Mary Ann Hillard at the same facility (Tr. 47, 60).

When Plaintiff visited psychiatrist Rakesh Chandra, M.D. in March of 2001, she reported that the treatment plan with Ms. Cain seemed to be working (Tr. 77). Dr. Chandra diagnosed Plaintiff as having an anxiety disorder with possible cyclothymic mood swings and borderline personality disorder (Tr. 77). He recommended that Plaintiff return to Dr. Bledig for prescription of a mood stabilizer like Depakote (Tr. 78). Plaintiff claimed that she was suffering residual psychological problems from severe emotional, sexual, and physical abuse by her second husband, but that she was receiving physical and financial support from her boyfriend at that time (Tr. 77).

In August of 2001, Plaintiff returned to Dr. Chandra for an emergency assessment because she had run out of medication and was experiencing withdrawal symptoms (Tr. 75). She reported breaking down in trauma-group therapy two days before meeting with Dr. Chandra (Tr. 76). Dr. Chandra administered the Beck's Depression Inventory during this emergency assessment, and he assigned Plaintiff a scored of fourteen, which is indicative of severe depression (Tr. 76). Dr. Chandra suggested that the Plaintiff undergo psychiatric hospitalization to assist her in coming off the medications (Tr. 75). She declined, stating that the medication helped her a lot (Tr. 75). She desired not to be hospitalized, and reported being cared for by her uncle and receiving help from her neighbor in order to obtain the medication she needed (Tr. 75).

On October 22, 2001, Dr. Bledig assessed Plaintiff's ability to perform work-related activities on (Tr. 79-82). He stated that the Plaintiff was impaired in lifting or carrying, standing or walking, and pushing or pulling due to "poor concentration [and] motivation and cannot do any sustained activity which is why she has physical limitations" (Tr. 80). He further stated that

6

Plaintiff had limited manipulative functions because "she ha[d] swelling and stiffness of hands, fingers, painful knees, ankles" (Tr. 81). Environmental limitations listed were those caused by noise, dust, vibrations, hazards, and fumes as a result of Plaintiff's "severe anxiety" and "multiple arthritis" (Tr. 82). He indicated that Plaintiff was able to frequently perform handling, fingering, and feeling functions, and that she could sit, kneel, crouch, crawl, or stoop (Tr. 80-81).

On December 12, 2001, Plaintiff again consulted Dr. Bledig complaining of pain in her hands, back, and knees (Tr. 88). She stopped taking her blood pressure medication and reported severe anxiety and depression (Tr. 88). Dr. Bledig diagnosed Plaintiff with arthritic swelling of the joints and prescribed Celebrex (Tr. 88).

On July 22, 2002, he narrowed his diagnosis to "probably rheumatoid" arthritis when Plaintiff complained of pain from the elbows to the fingers (Tr. 169). He did not indicate that he ordered any type of diagnostic testing to confirm his diagnosis. Dr. Bledig reported on a medical evaluation form for the State of Illinois that Plaintiff had a twenty percent limitation of motion in her hand joints (Tr. 166). And Plaintiff's ambulation was normal with no need for a cane or crutch (Tr. 168). Dr. Bledig determined that Plaintiff could not lift more than ten pounds on a regular basis, that her capacity for standing, stooping, sitting, grasping, and performing physical activities of daily living was reduced by up to twenty percent, that her capacity for walking, bending, turning, climbing, pushing or pulling, and fine manipulation was reduced by twenty to fifty percent, and that her finger dexterity was reduced by more than fifty percent (Tr. 168). He also states that Plaintiff's mental impairments caused moderate restriction of daily activities, marked restriction of social functioning and concentration, persistence, and pace, but no episodes of decompensation (Tr. 168).

7

Throughout 2003 and 2004, Plaintiff continued to complain of symptoms consistent with her arthritis (Tr. 154-63).  Dr. Bledig gave her Celebrex samples and prescribed Xanax and Trazodone for her anxiety disorder (Tr. 154-63).  During a visit in 2004, Plaintiff complained of back pain from an injury sustained while skating (Tr. 156).  She also complained that she suffered frequent panic attacks (Tr. 154-63).

Plaintiff's complaints of anxiety and pain continued into 2005 (Tr. 150-52).  At one appointment, Dr. Bledig noted "I believe this lady is disabled." (Tr. 151).

On September 23, 2005, Plaintiff was again evaluated by an agency-designated physician.  Dr. David J. Warshauer at the Egyptian Public and Mental Health Department diagnosed Plaintiff with ADHD, panic disorder without agoraphobia, moderate recurrent major depressive disorder, borderline personality disorder, and chronic mental illness (Tr. 136-41).  He reported Plaintiff's GAF to be 45 (Tr. 138).  He stated that "[p]ertaining to mood and affect, she was more agitated than almost anybody I have ever evaluated." (Tr. 138).  Dr. Warshauer reported that Plaintiff had seen several counselors at the Egyptian Health Center, beginning approximately six years prior.  He reported that Plaintiff had been seeing counselor Linda Griffin there for the past year.

 Dr. Warshauser noted on an assessment of the Plaintiff's ability to perform work-related activities, a marked restriction on the Plaintiff's ability to understand, remember, and carry out short, simple instructions (Tr. 139).  He also noted extreme impairment in the Plaintiff's ability to understand, remember, and carry out detailed instructions (Tr. 139).  He states, "This woman suffers from severe ADHD." (Tr. 139).

8

As pertaining to Plaintiff's ability to respond appropriately to supervisors, coworkers, and work pressures, Dr. Warshauser determined that Plaintiff's ability to respond appropriately to work pressures in a usual work setting would be extremely limited (Tr. 140).  He noted a marked restriction in Plaintiff's ability to interact appropriately with the public, supervisors, coworkers, and to respond appropriately to changes in a routine work setting (Tr. 140).  However, Dr. Warshauser did note that Plaintiff could manage benefits in her best interest (Tr. 141).

After this evaluation, Plaintiff returned to Dr. Bledig to obtain Ritalin to treat her ADHD (Tr. 150).  After obtaining Ritalin from Dr. Bledig, she reported during subsequent visits that the Ritalin was helping and that she was able to "do more activities" (Tr. 147-48).  In January or February of 2006, Dr. Bledig noted that Plaintiff's hypertension was under control (Tr. 147).

**The February 2006 Hearing**

At the hearing before the ALJ on February 7, 2006, Plaintiff testified in support of her claim and was represented by counsel (Tr. 203-47).  She stated that she maintained regular counseling appointments at Egyptian Health Services every one to two weeks (Tr. 210).  She had numerous pets, including a "real old kitty cat" that she cared for regularly (Tr. 212).  She used to run a grooming business out of her home, but she stated she stopped due to the pains she experienced as a result of her arthritis (Tr. 212).

Plaintiff elaborated regarding her illnesses at the hearing, stating she continued to suffer pain associated with arthritis, but could not afford blood testing for the arthritis (Tr. 244).  She claimed that she also suffered from depression, anxiety, and manic depression, in addition to her rheumatoid arthritis (Tr. 209).  She testified that she had been treated for depression for

9

approximately ten years, as well as chronic anxiety (Tr. 213).  Her reported treatments included a

battery of medications including Zoloft, Xanax, Trazadone, and Ritalin (Tr. 214).  She stated that

while she had only recently been diagnosed with ADHD, there is a history of the illness in her

family (Tr. 215).

She also testified regarding her symptoms.  She claimed that her arthritis was worsening,

and that she did  not always take medication because she is afraid of the "thing they had with the

Vioxx." (Tr. 219-20).  Plaintiff's self-reported pain on a ten-point scale was an eight (Tr. 220).

She said her dizzy-spells were also getting worse, recently causing her to fall off of her porch

(Tr. 224).  She claimed that her high blood pressure, headaches, backaches, neck-aches, and

stress resulted in her suffering pain that had caused her to fall when stepping over the baby gates

in her home that are used to restrain her dogs (Tr. 226).  She reported that her joint pain was

aggravated when she ran the vacuum, and she stated that the arthritis in her hands had gotten so

bad that she dropped  things.  She reported that she often had an elderly neighbor stay with her

(Tr. 227, 231-32).

Plaintiff also testified about her normal day.  She stated that she normally woke up

around 4 or 5 a.m., and got up later at 7 to 8 a.m. (Tr. 216).  She stated that she tended to her

dogs each morning after making a cup of coffee (Tr. 216).  While she used to walk the dogs on a

leash, she reported recently injuring her ankle and, as a result, no longer walking them (Tr. 216-

17).  She further stated that after she lets the dogs out she would sit on the couch and watch

television all day (Tr. 217).  She testified she used to cook full meals, but could not now with her

ailments.  Plaintiff reported that she last cooked a pot roast with potatoes and carrots at

Christmas (Tr. 231).  Plaintiff asserted that she now microwaves most of her meals, and does laundry and some other minor cleaning, but neglects other tasks (Tr. 217-19).

Plaintiff testified as to her level of physical activity as well, stating that during the previous summer, she started walking the half-mile to the end of her road and the half-mile back in order to lose weight and to help her depression (Tr. 228-29).  However, at the time of the hearing, Plaintiff stated she had difficulty walking the few blocks from the car to the building (Tr. 230).  Plaintiff also reported that she broke her toe on her left foot, although she stated she had no idea how it occurred (Tr. 230).  She further testified that she had problems walking and standing because she would lose her balance (Tr. 217). Although she held a valid driver's license, Plaintiff only drove about once a week (Tr. 232).

According to Plaintiff, her life changed substantially after her divorce – she used to go out and function, but now she would go three to four weeks without leaving her home (Tr. 222-23).  She reported no income, and that she relied on her parents and public aid to pay her bills (Tr. 223-24).  She said she could afford all of the medications she has been prescribed (Tr. 224).

She has only been employed a couple of times in the last three decades, working at a veterinarian's office for a couple of months thirty years ago, a kennel for two years, and as a dog groomer out of her home (Tr. 233-34).  She now groomed her own dogs, but she stated that it took her all day due to her ailments (Tr. 235-36).

Ms. Lisa Courtney, a vocational expert, also testified on behalf of the agency at the hearing.  Since Plaintiff had no relevant work experience, Ms. Courtney testified as to the numbers of jobs available given Plaintiff's RFC (Tr. 245-247).  For a job in the category of "light work" that consists of lifting twenty pounds occasionally, ten pounds frequently, standing

11

six hours, sitting two hours, performing simple tasks with few social demands, and working in a

low stress environment without stringent speed or production requirements, and requiring the

ability to grasp but not repetitively pinch or rip, there were approximately four-thousand jobs

available with gross manipulation only, and three-thousand machine operator tender jobs (there

were more categories listed, but they were inaudible) that Plaintiff could perform (Tr. 245).  If

the activity level is reduced to sedentary, Ms. Courtney reported that there were one thousand

jobs as inspectors, six to eight-hundred jobs available as surveillance monitors, and some jobs

available as an attendant (Tr. 245-46).  Ms. Courtney testified, however, that if Plaintiff's

testimony were totally credible, there would probably not be any suitable jobs for a person with

the Plaintiff's limitations (Tr. 246).

**DISCUSSION**

**Standard of Review**

Supplemental insurance benefits are available only to those individuals who can establish

"disability" under the terms of the Social Security Act.  The claimant must show that she is

unable "to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months."  42 U.S.C.

§423(d)(1)(A).  The Social Security regulations enumerate the five-step sequential evaluation to

be followed when determining whether a claimant has met the burden of establishing a disability.

20 C.F.R. § 416.920.  The ALJ first considers whether the claimant is presently employed or

"engaged in substantial gainful activity." 20 § C.F.R. 416.920(b).  If she is, the claimant is not

disabled and the evaluation process is over; if she is not, the ALJ next addresses whether the

12

claimant has a severe impairment or combination of impairments which "significantly limits. . .

physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c).  Third, the ALJ

determines whether that severe impairment meets any of the impairments listed in the

regulations. 20 C.F.R. § 416.920(d).  If it does, then the impairment is acknowledged by the

Commissioner to be conclusively disabling. Id.  However, if the impairment does not so limit the

claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity"

("RFC") and the physical and mental demands of his past work. 20 C.F.R. § 416.920(e).  If, at

this fourth step, the claimant can perform her past relevant work, she will be found not disabled.

20 C.F.R. § 416.920(f).  However, if the claimant shows that her impairment is so severe that she

is unable to engage in her past relevant work, then the burden of proof shifts to the

Commissioner to establish that the claimant, in light of her age, education, job experience, and

functional capacity to work, is capable of performing other work and that such work exists in the

national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 416.920(g). The standard for judicial

review of an ALJ's finding that a claimant is not disabled within the meaning of the Social

Security Act is limited to a determination of whether those findings are supported by substantial

evidence. 42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security, as to any

fact, if supported by substantial evidence, shall be conclusive. . ."); Golembiewski v. Barnhart,

322 F.3d 912, 915 (7th Cir. 2003); Dixon v. Massanari, 270 F.3d 1171, 1176 (7th Cir. 2001); See

also White v. Barnhart, 415 F.3d 654, 659 (7th Cir. 2005) ("the reviewing court is not allowed to

substitute its judgment for the ALJ's by reconsidering facts, reweighing evidence, resolving

conflicts in evidence, or deciding questions of credibility" (citation and quotation marks

omitted)).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might

accept as adequate to support such a conclusion." Richardson v. Perales, 402 U.S. 389, 401,

(1972) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Sims v.

Barnhart, 309 F.3d 424, 428 (7th Cir. 2002); Green v.Shalala, 51 F.3d 96, 101 (7th Cir. 1995).

An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if

there have been no errors of law. Golembiewski, 32 F.3d at 915; Cannon v. Apfel, 213 F.3d 970,

974 (7th Cir. 2000).  However, "the decision cannot stand if it lacks evidentiary support or an

adequate discussion of the issues." Lopez ex. rel. Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir.

2003).

     An ALJ cannot substitute her own judgment for that of a physician without relying on

other medical opinions or authority on the record. Clifford v. Apfel, 227 F.3d 863, 870 (7th Cir.

2000) (quoting Rohan v. Chater, 98 F.3d 966, 968 (7th Cir. 1996)).  The ALJ must also accord

the appropriate weight to medical opinions. See 20 C.F.R. § 404.1527(d)(2).  For example, a

treating physician's opinion is afforded more weight because they are more familiar with the

patient's conditions and circumstances. Clifford, 227 F.3d at 870;  20 C.F.R. §

404.1527(d)(2).  That physician's opinion is afforded controlling weight if it is "if it is well

supported by medical findings and not inconsistent with other substantial evidence in the record.

Id.; Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003) ("[a] treating physician's opinion

regarding the nature and severity of a medical condition is entitled to controlling weight if it is

well supported by medical findings and not inconsistent with other substantial evidence in the

record.").  Further, the amount of weight to be given any particular medical opinion will depend,

in large part, on how complete and specific the clinical findings are and if it is consistent with

the other evidence on record.  20 C.F.R. § 1527.

The ALJ also has a duty to develop a "full and fair record," meaning, if the Plaintiff presents medical evidence of mental impairment, the ALJ must adequately assess that claim. Howell v. Sullivan, 950 F.2d 343, 346 (7th Cir. 1991); Creasy v. Barnhart, 30 Fed.Appx. 620, 624 (7th Cir. 2002).

**The ALJ's decision**

In her decision, the ALJ determined that Plaintiff (1) has never engaged in substantial gainful activity; (2) has several medically-determinable impairments, namely depression, anxiety, rheumatoid arthritis, ADHD, and borderline personality disorder, that qualify as "severe" for the purposes of 20 C.F.R. § 416.920(c); (3) does not suffer from any impairment or combination of impairments that meet the level of severity required by the Listing of Impairments, Appendix 1, Subpart P, Regulations No. 4; (4) is not fully credible in her testimony regarding the severity and extent of her disability; (5) has the residual functional capacity to lift/carry ten pounds frequently and twenty pounds occasionally, can stand/walk for six hours in an eight-hour workday, can grasp, and can perform simple repetitive tasks with few social demands in a low-stress environment without stringent speed or production requirements; (6) has no relevant past work to which she could return; (7) is a "younger individual" with the equivalent to a high school education with no relevant work experience; (8) could perform the significant number of jobs available in the regional and national economy that require only "light work;" and (9) was not under a "disability," as defined by 20 C.F.R. § 416.920(g) at any time through the date of the decision (Tr. 20-21).

In reaching this decision, the ALJ weighed the medical records in evidence, the Plaintiff's testimony and the government's vocational expert (Tr. 13-21). The ALJ afforded

little weight to the assessment of Ms. Mary Ann Hillard, M.A., because her findings were based on only one assessment and because "Ms. Hillard is not a psychiatrist or a psychologist." (Tr. 15). The ALJ did, however, note the severity of the GAF score and stated that she considered it in her assessment (Tr. 15).

The ALJ also found Plaintiff's statements to Dr. Vincent on November 21, 2000, not credible (Tr. 15-16). In support of credibility determination, the ALJ points out that Plaintiff stated that she had received treatment from the Bradford House for three days, while Dr. Bledig's notes indicate that she had spent only one day in the treatment center (Tr. 15-16, 44, 70). The ALJ also claims the credibility determination is supported by the fact that Plaintiff claimed to have little social contact, but she was driven to a medical appointment by a friend (Tr. 16, 45). The ALJ also states that Dr. Vincent observed Plaintiff walking with a limp and using an ambulatory device, but that Dr. Schutzenhofer had not observed these symptoms when he examined Plaintiff on the very same day (Tr. 15, 41-46).

Likewise, the ALJ discredited Plaintiff's statements made to Dr. Chandra on March 29, 2001 (Tr. 16). Plaintiff reported to Dr. Chandra that she suffered significant emotional, physical, and sexual abuse by her former husband which caused her psychological problems (Tr. 16, 77). The ALJ claims that this is inconsistent with Plaintiff's testimony that she was traumatized by her divorce, and not able to regain normal functioning after that time (Tr. 16, 222-23). The ALJ also cites the fact that in an emergency evaluation with Dr. Chandra on August 23, 2001, Plaintiff refused hospitalization to take her off of medication, stating that they "helped her a lot" (Tr. 16, 75). The ALJ claims that this statement contradicts Plaintiff's claim that her symptoms remain untreated with medication (Tr. 16).

16

The Medical Source Statement of Ability To Do Work-Related Activities completed by Dr. Bledig on October 21, 2001, was also largely discounted by the ALJ (Tr. 16-17).  She accorded the assessment of Plaintiff's physical abilities no weight because Dr. Bledig stated only that  mental defects that would prohibit Plaintiff from performing physical activities (Tr. 16, 79-82).  The ALJ found Dr. Bledig's environmental restrictions unsupported by the evidence, but she did consider the fact that Plaintiff had swollen hands as the swelling had been documented through objective findings (Tr. 16-17).

Although the ALJ did find some evidence of rheumatoid arthritis, she questioned the severity of the ailment (Tr. 17).  She complained that Dr. Bledig never ordered blood tests to verify the existence of the condition (Tr. 17-18, 244).  The ALJ also states that although Dr. Bledig reported severe impairment of functioning due to the arthritis, Plaintiff later reported hurting her back while skating and was able to perform daily living functions unaided.  Further, the ALJ states that no laboratory findings confirmed nodules consistent with rheumatoid arthritis (Tr. 17-18).

The ALJ likewise questioned the severity of Plaintiff's mental impairments and the diagnoses of those concurring doctors (Tr. 17-20).  Dr. Bledig's assessment of Plaintiff's mental impairments were discounted because "he is a family practitioner rather than a psychiatrist or psychologist." (Tr. 17).  Dr. Warshauer's diagnoses of severe ADHD, panic disorder, major depressive disorder, and borderline personality disorder were discredited, despite a GAF of forty-five (45), because he also concluded that Plaintiff could handle her own financial affairs (Tr. 17-18, 141).  The ability to handle one's financial affairs, the ALJ opined, was inconsistent with the low GAF score diagnosed (Tr. 17-18).

17

The ALJ did find credible the testimony of the vocational expert, who stated a person able to perform light work with additional non-exertional limitations can perform the following available jobs: 4,000 hand-occupations, 2,000 machine-operators, 2,000 inspectors, and 800-1,000 attendants (Tr. 20, 245-46).  Based on these findings, the ALJ denied Plaintiff's claim.

**Application of Law to Facts**

The evidence before the ALJ indicates that Plaintiff had a long history of mental illness, specifically, anxiety, panic attacks, and depression.  This history is amply supported in the record.

Plaintiff's family physician, Dr. Bledig, treated Plaintiff for these disorders for ten years and examined Plaintiff on a regular basis and she consistently complained of anxiety, panic attacks, depression, and difficulty sleeping.  Dr. Bledig treated Plaintiff with Xanax, Trazodone, and Zoloft.  In August 2002, Dr. Bledig assessed Plaintiff's ability to perform work-related activities for the Illinois Department of Human Services and reported that Plaintiff had markedly limited social functioning and a marked functional limitation in concentration, persistence, and pace.  The ALJ discounted Dr. Bledig's opinions because he is a family practitioner, not a psychiatrist or psychologist.

In November 2000, Plaintiff was diagnosed by therapist Mary Ann Hillard, M.A., a Licensed Professional Counselor, with the Egyptian Health Care Center, as having post-traumatic stress disorder, generalized anxiety disorder, and borderline personality disorder. Although Counselor Hillard estimated that Plaintiff's highest GAF score was seventy-five (75), her GAF at the time of the exam was only forty-five (45).  The ALJ discounted this evidence because Counselor Hillard is not a psychiatrist or psychologist.

18

The state agency evaluating psychologist, Dr. Vincent, diagnosed Plaintiff with panic disorder with agoraphobia, and moderate, recurrent major depression.  He noted, "her anxiety reaches panic like proportions and has an agoraphobic-like component to the point where she is rather withdrawn and isolated.  Her depression is evident in the form of anhedonia, dysphoria, feelings or worthless and hopeless [sic], some preoccupation with thoughts of death and dying and negativistic perception of self."  (Tr. 46).  The ALJ found Dr. Vincent's statements lacking in credibility because of a reported limp that showed inconsistency with the evaluation of another of the agency's medical doctors, and because of an error in reporting her history of mental health treatment.

Dr. Chandra saw Plaintiff in March of 2001, and found her to be "very anxious," diagnosing her with anxiety disorder with cyclothymic mood swings and also borderline personality disorder.  He recommended that Plaintiff be given a mood stabilizer to help with her mood swings, and further recommended that she continue seeing a therapist.  Dr. Chandra saw her again in August 2001, for an emergency evaluation due to problems with medication withdrawal.  Dr. Chandra reiterated her diagnosis of borderline personality disorder and anxiety disorder with mood swings.

Plaintiff was evaluated a second time for the agency in September 2005, by Dr. Warshauer, a licensed psychologist, who diagnosed her with Attention Deficit/Hyperactivity Disorder, panic disorder, recurrent, moderate, major depressive disorder, and borderline personality disorder.  He reported a GAF of forty-five (45).  In his evaluation, he stated that Plaintiff was "more agitated than almost anybody I have ever evaluated."  He attributed this behavior to ADHD.  In reporting her mental health history, Dr. Warshauer stated that Plaintiff

19

had several counselors at the Egyptian Health Center, beginning approximately six years prior, and for the past year she had seen counselor Linda Griffin.  Dr. Warshauer indicated that if Plaintiff were to receive social security benefits, she would be able to "handle her own financial affairs."  The ALJ found Dr. Warshauer's opinions to lack credibility because a GAF of forty-five (45) was inconsistent with a finding that Plaintiff could manage her own financial affairs.

Based on these medical reports and evaluations, the Court finds that the ALJ's determination regarding the existence and severity of Plaintiff's mental illness was not based on substantial evidence on the record as a whole.  The Court finds that the ALJ discounted the reports of these experts and improperly substituted her own determination regarding Plaintiff's mental illness.  Clifford, 227 F.3d at 870. This is not a case where there is a dispute among the experts, and the ALJ failed to accord the proper weight to each opinion.  Here, the physicians and psychologists agree Plaintiff suffers from anxiety, panic disorder, and major depression.  Not one treating or evaluating medical professional found that Plaintiff did not suffer from a serious mental illness.

In addition, the ALJ made a determination that Plaintiff never sought "significant treatment from mental health specialists" and was never hospitalized as a result of deteriorating mental health.  While she may not have been hospitalized, the evidence in the record belies a conclusion that she did not seek significant treatment from mental health specialists.  Plaintiff saw a number of mental health professionals at the Egyptian Health Care Center, and Dr. Warshauer, the state's evaluating psychologist, reported that Plaintiff had been seen by counselors there for six years and had seen the same counselor, Linda Griffin, for the past year.

Furthermore, the vocational expert who testified at the hearing indicated that if Plaintiff's testimony were found to be wholly credible, there would not be any jobs in significant numbers for a person with Plaintiff's limitations.  If the ALJ's conclusions are not supported by substantial evidence, then it is entirely possible that there would be no jobs available that Plaintiff could perform.

In conclusion, the Court finds that the ALJ, by discounting the opinion of experts, and improperly determining that Plaintiff had not sought psychological treatment, ignored substantial evidence that may support a finding of a disability.  For this reason, the case must be remanded for reevaluation of the nature and severity of Plaintiff's mental illness.

### CONCLUSION

Based on the foregoing, Plaintiff's petition is **GRANTED** and the case **REVERSED** under sentence 4 of 42 U.S.C. § 405(g) and **REMANDED** for further proceedings consistent with this Order, and a new decision that appropriately evaluates the nature and severity of Plaintiff's psychological impairments.

**DATED: September 29, 2007**

s/  *Donald G. Wilkerson*
**DONALD G. WILKERSON**
**United States Magistrate Judge**